444 S.E.2d 730

Connie MATNEY, Administratrix of the Estate of Troy Matney, Appellant,

v.

Robert W. LOWE, M.D., Hans Dransfeld, M.D., Dennis M. Burton, M.D., Hoyt J. Burdick, M.D., Clinton J. Pace, II, M.D., and St. Mary's Hospital, a Corporation, Appellees.

No. 21683.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 1994.

Decided May 26, 1994.

---

H. Truman Chafin, Gretchen Lewis Chafin, Williamson, for appellant.

Richard W. Stuhr, William J. Cooper, Jacobson, Maynard, Tuschman & Kalur, Charleston, for appellees.

PER CURIAM:

This case involves an appeal by the plaintiff below, Connie Matney, now appellant, from the May 14, 1992, final order of the Circuit Court of Cabell County, West Virginia, which refused the appellant's motion for a new trial.

Troy Matney suffered a back injury in a mine accident in 1987. On September 7, 1988, he underwent a spinal fusion surgery performed by Dr. Robert Lowe, M.D. Mr. Matney had pre-existing allergic asthma, which was followed during the initial part of his hospitalization by a pulmonary specialist, Dr. Hoyt Burdick, until September 9, 1988. At that point, Dr. Burdick noted that Matney's lungs were clear and the patient was stable. After a chest x-ray was determined to be clear, Dr. Burdick signed off the case.

On September 11, 1988, the nursing staff noted that Mr. Matney had a temperature of 101.4. Dr. Clinton Pace, a hospital resident, examined Mr. Matney and noted that he complained of some pleuritic right chest and shoulder pain. Dr. Pace also noted that the patient had decreased vital capacity in his lungs and had coughed up mucus. A chest x-ray was scheduled for the following morning. Dr. Lowe saw Mr. Matney the following morning and ordered blood gases and a ventilation perfusion scan (VQ scan). The chest x-ray and VQ scan were examined by Dr. Hans Dransfeld. On September 12, 1988, Dr. Dransfeld reported that the VQ scan had a "low probability for pulmonary embolus. The chest x-ray showed vaguely defined areas of infiltration through the lung bases, suggesting an inflammatory etiology." Thus, pneumonia was diagnosed, and Mr. Matney was treated with intravenous antibiotics.

On September 14, 1988, a follow-up chest x-ray was performed which showed "minimal clearing of the haziness at the right base with residual infiltrate and/or pleural fluid in that region." On September 16, 1988, Dr. Pace noted that Mr. Matney's temperature had been 101.4 the previous midnight and his white count was elevated. Dr. Lowe discharged Mr. Matney on September 16, 1988. On September 17, 1988, Mr. Matney died at

home. The medical examiner determined that the cause of death was a massive pulmonary thrombo embolism.

Suit was filed in 1990 against Drs. Lowe, Dransfeld, Burton, Burdick, Pace, and St. Mary's Hospital. St. Mary's Hospital and Dr. Burdick were voluntarily dismissed by the plaintiff prior to trial. On the morning of trial, Drs. Dransfeld and Burton settled with the plaintiff. Also on the morning of trial, Dr. Pace was voluntarily dismissed when the John Marshall School of Medicine was substituted in place of Dr. Pace. Shortly thereafter, the School of Medicine settled with the plaintiff. Thus, Dr. Lowe was the only defendant remaining in the trial.

At trial, evidence was adduced by the plaintiff from two expert witnesses, Dr. David Lincoln and Dr. Roger Maxfield. Dr. Lincoln, an orthopedic surgeon, testified that Dr. Lowe had fallen below the standard of care in his treatment of Mr. Matney. Dr. Maxfield likewise testified that Dr. Lowe had fallen below the standard of care. However, he also testified that Dr. Dransfeld had fallen below the standard of care in his interpretation of the VQ scan. According to Dr. Maxfield, the VQ scan should not have been interpreted by Dr. Dransfeld as determining a low probability for pulmonary emboli. He contended that the VQ scan should have been interpreted as indeterminant, which would probably have changed Dr. Lowe's response. Dr. Lowe's attorneys pointed to Dr. Maxfield's statement that the misinterpretation of the scan was "probably the major point in the problem." Thus, Dr. Lowe's attorneys argued that Dr. Lowe acted only upon what was told to him by Dr. Dransfeld, that it was Dr. Dransfeld's duty to interpret the VQ scan, and that, consequently, Dr. Lowe was not liable for Troy Matney's death.

In December, 1988, the jury ruled that neither Dr. Lowe nor Dr. Dransfeld were negligent in this case. The plaintiff's motion for a new trial was denied by the Circuit Court of Cabell County on May 14, 1992. It is from this final ruling that the plaintiff below, now appellant, appeals.

■ The appellant's primary assignment of error is that the trial court erred in permitting the defendant to mention the exis-tence of other defendants in this case. Otherwise, the jury would have had no idea that other defendants had been involved, because they had all either settled or been dismissed prior to the trial. Counsel for Dr. Lowe informed the court that, while he had no intention of referring to any settlement amount, he felt the jury was entitled to know that Dr. Lowe was one of several defendants against whom allegations of negligence had been made. Plaintiff's counsel objected. The court stated that "Well, you are probably right in that respect. I may let him go that far. We'll take it up at the time. I may very well let you do that. There is still a comparative thing here." The trial judge concluded that he would allow defense counsel to ask Dr. Dransfeld if he had been a defendant in the case and if there had been allegations made against him, noting that, as a treating physician, the jury could well allocate negligence against him under the theory of comparative negligence. The court told defense counsel that he could advise the jury that there were defendants who had been parties to the case at one time, though they were no longer parties. However, no mention of settlement money was to be made.

The appellant complains that the court erred in allowing this testimony, claiming it prejudiced the jury into finding no liability because the jury thought the plaintiff had received sufficient compensation through prior settlements. Specifically, the appellant points to several incidents. First, the defense counsel asked Dr. Dransfeld who sued him. Plaintiff's counsel objected and was overruled because the court stated that the appellant was trying to transfer the blame from Dr. Dransfeld. The trial judge then advised defense counsel that he could not go much further on that issue. Shortly thereafter, in the same line of questioning, defense counsel asked whether Dr. Lowe had sued Dr. Dransfeld. Counsel objected, which objection was sustained. The appellant's primary charge of error relates to defense counsel's statement that "the only reason that they want you to ignore Dr. Dransfeld is because he is not a defendant. There is no pot of gold at the end of that rainbow. Only at the end of Dr. Lowe's. So now they want

you to ignore the fact that their own expert took the stand and stated that the critical mistake was made by a non-defendant." The court overruled the appellant's objection to this statement. The rationale seems to be that since the appellant tried to push the blame off Dr. Dransfeld and onto Dr. Lowe, the jury had the right to know that Dr. Dransfeld had been a defendant prior to trial and the appellant had reason to attempt to shift the blame away from Dr. Dransfeld.

Appellant's counsel contends that it was highly prejudicial for the court to allow defense counsel to repeatedly mention that the other doctors were former defendants and to blatantly state that there is no "pot of gold" at the end of Dr. Dransfeld's rainbow. Appellant's counsel contends that it became clear to the jury that some doctors had, in fact, settled: "The jury was then left to speculate as to how much money the plaintiff had already received. Certainly, the jury was curious as to why they were not informed. And even more certainly, the jury felt that the plaintiff was attempting to deceive them in some way when the plaintiff was not allowed to answer, in any fashion, defense counsel's repeated assertions about other doctors being sued and no longer being in this case."

■ We disagree with the appellant's argument. There is no hard and fast rule in West Virginia regarding the use of testimony concerning settlements and dismissals at trial. In *Groves v. Compton*, 167 W.Va. 873, 280 S.E.2d 708 (1981), the Court stated that "[w]e do not believe that any fixed rule can be set except to state that neither counsel should be permitted to take unfair advantage of the settlement and dismissal in presenting and arguing their case." *Id.* 280 S.E.2d 708 at 712. "In the absence of a written stipulation by the parties, the better rule is to leave the question of the manner of handling the offset occasioned by the settlement by a joint tortfeasor, as well as the manner of inform-

ing the jury that such party has been dismissed from the lawsuit, to the sound discretion of the trial court." *Id.* at syl. pt. 2. In *Groves,* the Court contemplated situations such as this and allowed the trial court the choice of whether to permit the testimony. In this case, the trial court did not abuse its discretion.

■ The appellant's remaining assignment of error, that the verdict was against the weight of the evidence, is without merit. In *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), the Court stated that "[i]n determining whether there is sufficient evidence to support a jury verdict, the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." *Id.* at syl. pt. 5.

■ There is more than enough evidence in the record which would support the jury's finding that Dr. Lowe was not negligent. The testimony of the appellant's own expert, Dr. Maxfield, pointed out that Dr. Lowe had relied upon the radiologist's erroneous interpretation of the VQ scan. Thus, the jury verdict was not contrary to the weight of the evidence. Accordingly, we affirm the May 14, 1992 order of the Circuit Court of Cabell County.

Affirmed.